COMMISSIONER OF TRANSPORTATION *v.* BAKERY PLACE LIMITED PARTNERSHIP ET AL.*

Superior Court, Judicial District of New Britain
File No. CV-00-0503028-S

Memorandum filed November 16, 2005

---

* Affirmed. *Commissioner of Transportation* v. *Bakery Place Ltd. Partnership*, 101 Conn. App. 401, 924 A.2d 141 (2007).

*Michael P. Barry*, for the named defendant.

*Drew S. Graham*, assistant attorney general, with whom was *Richard Blumenthal*, attorney general, for the plaintiff.

BURKE, J. This is an eminent domain proceeding concerning certain real estate known as 634-640 Main Street in New Britain (634 Main Street). On July 7, 2000, the plaintiff, the commissioner of transportation (commissioner), condemned the property belonging to the named defendant, Bakery Place Limited Partnership (Bakery Place). The commissioner assessed damages at $1. At the time of the taking, Valerie Miceli and Vincenzo Miceli were the partners of Bakery Place.

An unoccupied building was located on the subject property. This building was constructed around 1886, was three stories tall, and was boarded up, vacant and gutted. The building's area was 4578 square feet, and a one-story building was attached to the three-story building. The subject property was purchased by Bakery Place in 1985 for $55,000. Bakery Place hired an architect, Thomas A. Whaples, at a cost of $11,500, to develop plans to renovate the building. Bakery Place also hired G&W Construction, a contractor, at a cost of $6320, to gut the building.

The building contained asbestos and lead, which was common for this type of building. The presence of asbestos and lead, as they existed in the building at the time of demolition, did not violate any laws or regulations. Had the building not been demolished, it would have been unnecessary to remove these substances.

Vincenzo Miceli, who was familiar with the interior of the building, testified that the property was worth more than $50,000.

On behalf of the plaintiff, John Nitz testified as an expert in the field of real estate appraisals. Nitz, who

never went into the building, concluded that the highest and best use of the property would be vacant land and valued the land at $13,000. He also concluded that the cost to demolish the building would be more than $17,000.

On behalf of Bakery Place, Matthew Welinsky testified as an expert in the field of real estate appraisals. Welinsky, who never went into the building, also testified that the highest and best use of the subject property would be vacant land. Welinsky found three comparative sales of vacant land and valued the land at issue at $13,000. Because Welinsky found that the best use of the property would be vacant land, he used the Marshall Valuation Service to conclude that the cost to demolish the building would be $8000. Subtracting $8000 from $13,000, Welinsky arrived at a property value of $5000.

Welinsky also testified that when he used the replacement cost method instead of the comparable sales method, he found the value of the property to be $21,000. He arrived at this value on the basis of the land's value being $13,000 and the building's value being $8000.

The plaintiff paid $35,208.67 to demolish the building and $22,334.14 to remove the asbestos.

In the previous trial, in its memorandum of decision filed on January 6, 2003, the court, *Hon. Arnold W. Aronson*, judge trial referee, found the fair market value of 634 Main Street to be $37,840. The court based its determination on the fact that the city of New Britain assessor, for property tax purposes, determined through utilization of the cost approach method of valuation, that the land's value as vacant was $27,550 and that the building's value was $10,290. With regard to the attempt of the plaintiff to offset the remediation cost from its award to Bakery Place, the court found that it would be "more credible to maximize the value of the building for Bakery Place to encapsulate whatever

asbestos existed on the premises rather than demolish the premises at a substantial loss." *Commissioner of Transportation* v. *Bakery Place Ltd. Partnership*, and *Commissioner of Transportation* v. *Miceli*, Superior Court, judicial district of New Britain, Docket Nos. CV-00-0503028-S and CV-00-0503209-S (January 6, 2003) (*Hon. Arnold W. Aronson*, judge trial referee).[1] Therefore, the court ruled that judgment may enter in favor of Bakery Place in the amount of $37,840, less the $1 sum that the state had already paid to Bakery Place. The court also awarded Bakery Place interest at the statutory rate of 10 percent pursuant to General Statutes § 37-3a,[2] from the date of the taking. In addition, the court also awarded $1000 in appraisal fees plus costs to Bakery Place.

The plaintiff appealed from the judgment of the trial court on several grounds. See *Commissioner of Transportation* v. *Bakery Place Ltd. Partnership*, 83 Conn. App. 343, 344, 849 A.2d 896 (2004). One of those grounds was that the trial court erred in taking "judicial notice of the fact that asbestos in the property acquired by eminent domain could have been encapsulated at a lower cost than demolishing the building . . . ." Id., 344. The Appellate Court agreed with the plaintiff in finding that the issue of "whether asbestos in the building could be safely and economically contained was not a proper subject for judicial notice." Id., 347–48.

The second ground for the plaintiff's appeal was that the trial court used a five year old municipal property

---

[1] The condemnation involved two parcels of land and generated two separate actions: *Commissioner of Transportation* v. *Bakery Place Ltd. Partnership*, supra, Superior Court, Docket No. CV-00-0503028-S, and *Commissioner of Transportation* v. *Miceli*, supra, Superior Court, Docket No. CV-00-0503209-S. This memorandum concerns the first action only.

[2] General Statutes § 37-3a (a) provides in relevant part: "Except as provided in sections 37-3b, 37-3c and 52-192a interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . ."

tax assessment in determining the fair market value of the subject property. Id., 344. The Appellate Court found that the trial court erred in relying on the tax assessment and stated: " 'It is almost everywhere the law that the value placed upon a parcel of land for the purposes of taxation by the assessors of the town in which it is situated is no evidence of its value for other than tax purposes.' 5 P. Nichols, Eminent Domain (3d Ed. Rev. 2003, J. Sackman ed.) § 22.1, p. 22-1; see [*Connecticut Printers, Inc.* v. *Redevelopment Agency*, 159 Conn. 407, 414, 270 A.2d 549 (1970)]. Moreover, '[i]t has been held . . . that the amount of taxes, as a derivative of the assessed value, is . . . inadmissible as evidence of value in eminent domain.' 5 P. Nichols, supra, pp. 22-18 through 22-19." *Commissioner of Transportation* v. *Bakery Place Ltd. Partnership*, supra, 83 Conn. App. 351.

## I

## APPRAISAL METHOD

The plaintiff argues that this court should adopt Nitz' testimony and find that "$1 is a fair and reasonable assessment of the damages" that Bakery Place incurred from the taking. According to the plaintiff, when Nitz prepared his original report, he was unaware that the actual cost of demolition was approximately $35,000. The plaintiff argues that once Nitz became aware of that figure, he reduced the land valuation figure by $35,000 instead of $17,000 and arrived at a taking value of $1 again. According to the plaintiff, once this court finds that demolition costs exceed the value of the land, it can find that the fair market value of the property at the time of taking was $1.

The plaintiff further argues that although Welinsky testified that using the replacement cost method could increase the property's fair market value to $21,000, he also testified that this figure did not change his opinion that the property's fair market value at the time of

the taking was $5000. Also, the plaintiff asserts that Welinsky's determination through the cost replacement method that the building was potentially worth $8000 directly contradicts his opinion that the highest and best use for the property was vacant land. Therefore, it is the plaintiff's position that if the court adopts Welinsky's appraisal report, the most it can award Bakery Place is $5000.

Bakery Place asserts that this court should adopt Vincenzo Miceli's testimony and award it $50,000 in damages. Bakery Place argues that this is because Vincenzo Miceli testified that he was the owner of other property in Connecticut and was knowledgeable about values in the city. It is Bakery Place's position that Vincenzo Miceli was the only witness testifying about the property's value who had actually entered the building. According to Bakery Place, a landowner is competent to testify regarding his or her land's value.

If the court does not adopt Vincenzo Miceli's testimony, Bakery Place argues, it urges the court to utilize the replacement cost method about which Welinsky testified. According to Bakery Place, Welinsky testified that when he used the replacement cost method, he almost completely depreciated the building at 92.5 percent of its replacement cost to arrive at a value of $8500.[3] Bakery Place argues that it would be more reasonable to leave the building intact on the land and hope to use the building shell during the course of a future renovation than to demolish the building, which would render the property worthless.

## II

## ASBESTOS

The plaintiff argues that Henry Laliberte, the plaintiff's environmental expert, testified that he personally

---

[3] This statement appears to be in contradiction of both parties' statements that Welinsky testified that the building was worth $8000.

inspected the building and identified seventeen different types of asbestos containing material in the building. Also, the plaintiff maintains that Laliberte found during the course of his inspection 23 mg/L leachate of hazardous lead material. The plaintiff further asserts that Laliberte identified eleven different types of hazardous material either in the building or on the premises. In addition, the plaintiff contends that it removed sixty cubic yards of asbestos material from the building before the building was demolished.

Furthermore, the plaintiff argues that it was Laliberte's testimony that remediation costs would have been incurred whether the building was to be demolished or renovated. The plaintiff maintains that it was Laliberte's position that any demolition or renovation would have been subject to Environmental Protection Agency regulations, which would have required the property owner to remediate, abate and remove asbestos before the occurrence of any building demolition or renovation.

The plaintiff relies on *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 256 Conn. 813, 833, 776 A.2d 1068 (2001), in support of its argument that the court, in determining the fair market value of the property, should consider evidence pertaining to environmental contamination and remediation costs to determine if and how these factors affect that value. The plaintiff concedes that although this court is not obligated to discount the remediation costs on a dollar for dollar basis, it is permitted to do so.

The plaintiff argues that Nitz testified that appraisers, in determining the value of real property, customarily rely on environmental experts' reports finding the existence of asbestos or other hazardous materials on the property. Also, the plaintiff asserts that Nitz testified that appraisers, in determining the value of property, customarily use the information that the commissioner

provides that shows how much remediation would actually cost.

Although Bakery Place also cites *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, supra, 256 Conn. 813, it asserts that in the present case, the evidence clearly demonstrates that remediation was needed only because the building was to be demolished. Also, Bakery Place maintains that although *Northeast Ct. Economic Alliance, Inc.*, held that evidence of remediation is admissible, this should not necessarily result in a dollar for dollar reduction of the property's fair market value.

## III

## LAW

"The fifth amendment to the United States constitution, as applied to the states through the due process clause of the fourteenth amendment . . . provides that 'private property [shall not] be taken for public use, without just compensation.' U.S. Const., amend. V. Article first, § 11, of the Connecticut Constitution similarly provides that '[t]he property of no person shall be taken for public use, without just compensation therefor.' " (Citation omitted.) *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, supra, 256 Conn. 827–28.

"[T]he amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking. . . . In determining market value, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land . . . . The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use. . . . The highest and best use concept, chiefly employed as a starting point in estimating the value of real estate by appraisers, has to do with the

use which will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate. . . . In determining its highest and best use, the trial [court] must consider whether there was a reasonable probability that the subject property would be put to that use in the reasonably near future, and what effect such a prospective use may have had on the property's market value at the time of the taking. . . .

"[B]ecause each parcel of real property is in some ways unique, trial courts must be afforded substantial discretion in choosing the most appropriate method of determining the value of a taken property. . . . In condemnation hearings, the state referee sitting as a court [of] appeals . . . is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of this court with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence, his general knowledge and his viewing of the premises." (Internal quotation marks omitted.) *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 272 Conn. 14, 25–26, 861 A.2d 473 (2004).

"Although the market value of the taken property is ordinarily the most appropriate measure of fair compensation . . . we have long held that other measures may be appropriate when the fair market value measure of damages does not fully compensate the owner." (Citation omitted.) *Alemany* v. *Commissioner of Transportation*, 215 Conn. 437, 444, 576 A.2d 503 (1990).

"[A]t least four methods exist for determining the fair market value of property for taxation purposes: (1) analysis of comparable sales; (2) capitalization of gross income; (3) capitalization of net income; and (4) reproduction cost less depreciation and obsolescence."

(Internal quotation marks omitted.) *Carol Management Corp.* v. *Board of Tax Review*, 228 Conn. 23, 36 n.15, 633 A.2d 1368 (1993).

## A

### Comparable Sales Method

"The comparable sales approach has long been an approved method for ascertaining the fair market value of property." *Melillo* v. *New Haven*, 249 Conn. 138, 150 n.22, 732 A.2d 133 (1999). "Fair market value is generally best ascertained by reference to market sales. . . . Where this method is unavailable, however, other means are to be found by which to determine value. . . . A variety of such alternative methods for calculation of true and actual value have been approved by this court: use of the cost of reproduction with an adjustment for depreciation . . . use of the original property cost less depreciation . . . . As a rule, however, [n]o one method is controlling; consideration should be given to them all, if they have been utilized, in arriving at the value of the property." (Citations omitted; internal quotation marks omitted.) *Uniroyal, Inc.* v. *Board of Tax Review*, 174 Conn. 380, 385–86, 389 A.2d 734 (1978).

## B

### Cost Approach

"The cost approach to value is based on the assumption that a purchaser would not pay more for an improved property than the cost of constructing a similarly located property of equal utility. This method is especially practical when the appraised property has recently been built and represents the highest and best use of the site.

"Quite often, the cost approach may be the only approach that provides a reliable indication of value for a property. This is the case when the property is specifically designed for a special purpose and where comparables are simply not available. Conversely, the

cost approach is less reliable when the building improvements are older and reaching the end of their economic life. This is because of the difficulty in estimating a sound measure of depreciation for an old building.

"A cost approach can be premised on one of either two types of cost: Reproduction Cost and Replacement Cost. A reproduction cost is the estimated cost to construct an exact duplicate or replica of the building. This would entail the same design, materials and quality. Replacement cost on the other hand is an estimate of the cost to construct a building of equal utility but not necessarily of equal design, materials or quality. From a practical perspective, the use of replacement cost eliminates the need to estimate some forms of depreciation such as functional obsolescence. Nevertheless, any economic impact from the functional obsolescence, such as increased operating expenses from an inefficient building design, must still be considered." 7 P. Nichols, Eminent Domain (3d Ed. Rev. 2005) § 4.04 [3], pp. 4-52 through 4-53.

C

Asbestos

In *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, supra, 256 Conn. 826, the court stated that "under traditional constitutional principles of just compensation, evidence of environmental contamination and remediation costs may not be excluded, as a matter of law, from a condemnation proceeding . . . ."

General Statutes § 13a-76 provides in relevant part: "The reassessment by the court or such judge trial referee shall take into account any evidence relevant to the fair market value of the property, including evidence of required environmental remediation by the Department of Transportation. The court or such judge trial referee shall make a separate finding for remediation costs . . . ." The 1999 revision of § 13a-76, which was

in effect at the time of the taking, did not contain this language. See Public Acts 2001, No. 01-75. Nevertheless, this court need not determine whether the present incarnation of § 13a-76 applies retroactively to the date of the condemnation because the court in *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, supra, 256 Conn. 826, found that the admissibility of evidence of environmental contamination and remediation costs was not dependent on any statutory authority.

Although the court in *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, supra, 256 Conn. 813, held that evidence of environmental contamination and remediation costs was admissible; id.; the court stated: "That is not to say that the admissibility of the costs of remediation should necessarily result in, or should necessarily preclude, a dollar-for-dollar reduction in the market value of the property. Nor is such evidence determinative . . . . Just as the cost of repair of physical damage may bear on the fair market value of property in other legal contexts . . . the cost of remediation of contamination may bear on the fair market value of property in the condemnation context. It bears emphasis that, in calculating just compensation in a valuation trial, a trial court may seek aid in the testimony of experts, but must ultimately make its own independent determination of fair compensation . . . on the basis of all the circumstances bearing upon value." (Citations omitted; internal quotation marks omitted.) Id., 835.

## IV

## CONCLUSION

Although Vincenzo Miceli, as an owner, has the right to give his opinion as to the market value of the property,[4] his opinion that it was $50,000 was not supported

---

[4] "It is well settled that an owner of property is competent to testify as to its market value." *Misisco* v. *La Maita*, 150 Conn. 680, 684, 192 A.2d 891 (1963).

by the evidence.[5] Both appraisers opined that the highest and best use of the property would be as vacant land. They both used the comparable sales appraisal approach, and both estimated the value of the land to be $13,000, minus the cost of the demolition of the building. One of the appraisers estimated the demolition costs to be $8000, and the other estimated it to be more than $17,000. Neither appraiser, however, entered the building. Moreover, neither appraiser knew that there was asbestos in the building. Obviously, if they had been aware of the eventual cost of more than $35,000 for the demolition and asbestos removal, their estimates would have been greatly reduced.

Although Welinsky, Bakery Place's expert, mentioned that the property might be valued at $21,000 using the replacement cost method of appraisal, upon further questioning, he reverted to his original estimate of $5000. He arrived at that amount by deducting an estimated demolition cost of $8000 from the estimated land value of $13,000.

The court hereby determines that the highest and best use of the property at the time of the taking to be as vacant land. The land was worth $13,000 before deducting the cost of demolition and asbestos removal.

A ready, willing and able prospective purchaser would certainly have had the building inspected. At the time, the prospective purchaser would have obtained an estimate as to the cost of demolition and asbestos removal. And, there is no doubt that the estimate would have far exceeded the value of the property. Of course, it is not likely that a prospective purchaser would have

---

[5] "Care must be taken . . . not to substitute for reality the mere hope of the owner that the property might be used for some specific purpose." (Internal quotation marks omitted.) *United States* v. *Certain Parcels of Land,* 327 F. Sup. 181, 186 (W.D.N.Y.), aff'd sub nom. *United States* v. *160.40 Acres of Land,* 443 F.2d 375 (2d Cir. 1970), quoting *Matter of City of Rochester (Smith St. Bridge),* 234 App. Div. 583, 586, 255 N.Y.S. 801 (1932).

paid an amount in excess of the market value of the property.

Accordingly, the court finds that the fair market value of the property, as of the date of the taking, taking into account all factors, including the cost of demolition and asbestos removal, was $1. Because the fair market value does not exceed the amount of assessed damages by the commissioner, Bakery Place is not awarded the appraisal fees.

Judgment is entered accordingly.